UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RITA KRUK,<br><br>       Plaintiff,<br>v.<br><br>METROPOLITAN LIFE INSURANCE CO., INC., and PECHINEY PLASTIC PACKAGING, INC.,<br><br>       Defendants. | 3:07-CV-01533 (CSH)<br><br>**RULING AND ORDER**<br><br>**ON PLAINTIFF'S SUPPLEMENTAL MOTION TO COMPEL [doc. #45]** |

HAIGHT, Senior District Judge:

**I.     Background**

The factual background of this case is described in the Court's previous ruling on plaintiff Rita Kruk's original motion to compel.  *See* Memorandum Opinion and Order [doc. #38], 46 Employee Benefits Cas. 2777, 2009 WL 1481543, 2009 U.S. Dist. LEXIS 46454 (D. Conn. May 26, 2009) [hereinafter "Discovery Ruling"].  Familiarity with the Discovery Ruling is presumed.

The Court is now called upon to interpret the meaning of the Discovery Ruling with respect to the production of MetLife's internal operating guidelines — the guidelines that set procedures for appeals of coverage under defendant Pechiney's disability plan.  Because the discussion contained in my previous ruling is germane here, I repeat it for convenience:

> MetLife has cited several district court cases from other judicial circuits to show that "[t]he legal proposition that claim manuals must always be produced as part of the Administrative Record has been squarely rejected."  I am not convinced by these cases.
>
> The plain language of the statute on the issue of relevancy is inescapable: "A document, record, or other information shall be considered 'relevant' to a claimant's claim if such document, record, or other information . . . (iv) [i]n the case of a . . . plan

> providing disability benefits, constitutes a statement of . . . *guidance* with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, *without regard to whether such advice or statement was relied upon in making the benefit determination.*"  29 C.F.R. § 2560.503-1(m)(8) (emphases added).

2009 WL 1481543 at *5, 2009 U.S. Dist. LEXIS 46454 at *18-19 (citation omitted).  I ordered MetLife to produce any such statements.[1]

But I also ruled that Kruk's discovery requests had been overbroad.  Kruk had requested "'*[a]ll* internal operating procedures, guidelines and documents concerning the manner in which the Company undertakes review of appeals of claims for long term disability insurance.'"  2009 WL 1481543 at *6, 2009 U.S. Dist. LEXIS 46454 at *20-21 (emphasis in original) (quoting Pl.'s Mem. ex. G [doc. #23-8] at 4).  That request could be construed to embrace a wide-ranging inquiry into *all* of MetLife's procedures for administering the various disability plans of its various clients, regardless of whether those procedures could have applied in her case.

## II.  Discussion

During the deposition of Sharon Muldrow, the MetLife employee who administered Kruk's long-term-disability appeal, plaintiff "learned that MetLife has a manual which sets forth practices for handling long term disability claims and appeals.  MetLife never previously identified the existence of this document and has only recently acknowledged its existence."  Pls.' Reply [doc. #50] at 2.

MetLife claims that the the manual, which it calls the "Claims Management Guidelines" or "CMG," is not responsive to plaintiff's discovery requests or to the Court's previous Order.  It

---

1.  Specifically, I ordered MetLife to "produce any "statement of policy or guidance *with respect to the plan* [and] *concerning the denied treatment option or benefit for the claimant's diagnosis*, without regard to whether such advice or statement was relied upon in making the benefit determination."  *Id.*  The emphasis is different, but the language is functionally identical.

claims this is so, even though it does not deny that the manual prescribes procedures for handling claims like Kruk's.  MetLife's argument against the responsiveness of its manual turns on the key phrases of limitation contained in my previous Discovery Ruling, taken from 29 C.F.R. § 2560.503-1(m)(8): "with respect to the plan," and "concerning the denied treatment option or benefit for the claimant's diagnosis."

In this renewed motion to compel, Kruk argues that these key phrases embrace the manual that MetLife refuses to produce.

MetLife, in turn, relies on the limiting scope of the key phrases, arguing that it has "twice confirmed through sworn testimony that it does not maintain any statement of policy or guidance with respect to the disability plan at issue in this case."  Opp'n Br. [doc. #48] at 2.  In other words, under MetLife's interpretation, in order to be responsive in this case, the manual would have to *explicitly* refer to *both* her employer's disability plan and the particular treatment option or benefit she sought.

This interpretation is confirmed by the Supplemental Affidavit of Timothy Suter, attached to MetLife's opposition brief.  Suter is a Litigation Specialist at MetLife who claims to have personal knowledge of the claim at issue in this case. Supp. Aff. ¶ 4, MetLife Opp'n ex. 5 [doc. #48-2 at 23].  Suter further avers:

> 7.   MetLife's Claim Management Guidelines ("CMG") are not tailored to any particular plan or type of plan and are therefore not a statement of policy or guidance with respect to the plan governing Ms. Kruk's claim.  MetLife does not possess, and I am not aware of the existence of any statement of policy or guidance with respect to the plan governing Ms. Kruk's claim, with the exception of the applicable summary plan description ("SPD").
>
> 8.   The CMG also do not contain any statement of policy or guidance regarding long term disability claims made by claimants diagnosed with lupus or mixed connective tissue disease, and I am

>   not aware of the existence of any statement of policy or guidance regarding long term disability claims made by claimants diagnosed with lupus or mixed connective tissue disease.

*Id.* ¶¶ 7-8.

In my previous ruling, I thought that the plain language of § 2650 clearly provided for the type of discovery that plaintiff was seeking. By focusing on certain words of limitation, MetLife argues that *none* of its Claims Management Guidelines is "relevant" within the plain language of the regulation. In short, MetLife argues that the regulation is ambiguous, and that the ambiguity favors nondisclosure.

Assuming for the purposes of argument that the regulatory language is ambiguous, I nevertheless conclude that it should be construed to provide the discovery that Kruk seeks. I reach that conclusion after examining the history behind the regulation, and the intent that motivated its adoption.

### A.   Regulatory History behind 29 C.F.R. § 2560

When the Department of Labor adopted the current version of 29 C.F.R. § 2560, the regulation that compelled the result of my previous opinion, the Department explained the revised regulation in a lengthy memorandum. ERISA; Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed. Reg. 70,246, at 70,252 (Nov. 21, 2000) [hereinafter "Announcement Memo"]. That discussion, reproduced in the margin,[2] does not directly define

---

2.   Because that memorandum is the only source of "legislative intent" behind the current regulation, I quote the relevant discussion here in full:

>   *The preamble to the proposal discussed the Department's interest in providing claimants sufficient access to information that could aid them in determining whether a plan and its agents had acted fairly and consistently in denying their claims. In particular, the Department was concerned about claimants' difficulties in obtaining sufficient information to determine whether a particular claims decision comported with prior decisions on similar issues*

the key phrase, "statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for that claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the determination."  Indeed, the memorandum treats that sentence as though it *solves* a long-running debate over the breadth of a plan's disclosure obligations.

> *and whether a claimant would be justified in challenging a decision as defective under the Act on that basis.*  In this regard, the Department stated in the preamble that it was considering requiring plans to disclose, after an adverse benefit determination on review, documents and records relating to previous claims involving the same diagnosis and treatment decided by the plan within the five years prior to the adverse benefit determination (up to a maximum of 50 such claims). The disclosure obligation would have been limited to cases in which a claimant commences litigation over the benefit determination and would have been further limited, with respect to insured benefits, to claims involving the same plan or insurance contract language.
>
>   This proposal was opposed by many commenters representing employers, plans, plan administrators, and insurers. They asserted that such a requirement would be prohibitively expensive to implement and would provide claimants with little information of any benefit. They also asserted that requiring this disclosure would be beyond the Department's regulatory authority under section 503 of the Act.
>
>   The Department has seriously considered the objections raised to this suggestion in the preamble of the proposal and has altered its approach to the problem in order to reduce the potential burden on plans and avoid any suggestion of possible interference with the civil discovery processes in litigation. Subparagraph (b)(5) provides, as a general requirement for reasonable claims procedures for all plans, that a plan's claims procedures must include administrative safeguards and processes designed to ensure and to verify that benefit claims determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants. Courts have long recognized that such consistency is required even under the most deferential judicial standard of review. It is the view of the Department that this provision does no more than to require a plan

However, when the discussion is taken as a whole, it provides insight into the agency's intent: it identifies the "mischief" against which the regulation was aimed, and it makes clear that the awkward language in § 2560.503-1(m)(8)(iv) is part of the intended remedy. *See, e.g., Rector, Holy Trinity Church v. United States*, 143 U.S. 457, 463 (1892) (searching for statutory

---

to formalize, as a part of its claims procedures, the administrative processes that it must already have established and be using in operating the plan in order to satisfy basic fiduciary standards of conduct under the Act. The Department has not articulated specific requirements as to how such processes should be designed, believing that plans should have flexibility and are capable of monitoring their internal decisionmaking effectively and efficiently.

As a concomitant to this general requirement, subparagraph (m)(8)(iii) further provides that, among the information that a plan must provide a claimant upon request after receiving an adverse benefit determination, is any information that the plan has generated or obtained in the process of ensuring and verifying that, in making the particular determination, the plan complied with its own administrative processes and safeguards that ensure and verify appropriately consistent decisionmaking in accordance with the plan's terms. It is not the Department's intention in this regard to require plans to artificially create new systems for the sole purpose of generating documents that can be handed to a claimant whose claim is denied in order to satisfy this disclosure requirement. The Department anticipates that plans generally will have systems for ensuring and verifying consistent decisionmaking that may or may not result in there being disclosable documents or information pertaining to an individual claims decision.

The proposal attempted to clarify the 1977 regulation's requirement that claimants be afforded access, after a benefit denial, to "pertinent documents." Based on its conclusion from RFI comments that there was substantial public confusion concerning the meaning of the term "pertinent," the Department proposed to replace that term with the term "relevant." The proposal further stated that a document would be considered "relevant" to a claim whether or not such document was in fact relied upon by the plan in making the adverse benefit determination. As stated in the preamble to the proposal, the

intent by examining "the evil which it is designed to remedy," invoking without citation to the so-called Rule in *Heydon's Case*, 3 Co. Rep. 7, 76 Eng. Rep. 637, 639 (1584)).

For example, the announcement contains a relevant discussion of a proposal that was subsequently abandoned in the final revision. The abandoned proposal had been intended to give

---

> Department believed that these changes would make clear that claimants must be provided access to all of the information present in the claims record, whether or not that information was relied upon by the plan in denying the claim and whether or not that information was favorable to the claimant. Such full disclosure, which is what the 1977 regulation contemplated, is necessary to enable claimants to understand the record on which the decision was made and to assess whether a further appeal would be justified.
>
> Commenters representing plans, employers, insurers, and plan administrators expressed dissatisfaction with this attempted clarification. The main source of their objection was that the proposal failed to define adequately the scope of the intended disclosure. In their view, the use of the term "relevant," particularly when coupled with the modifier that information need not have been relied upon to be relevant, would impose an unlimited burden on plans to search their records for any information relevant in the broadest sense to the claim, whether it was in any way related to the actual claims process. These commenters feared that plans would face added costs of keeping track of, and disclosing, a large amount of information generally accessible to the decisionmaker, without regard to whether such information was in any way utilized in the decisionmaking process.
>
> The regulation responds to this concern. While retaining the term "relevant" in subparagraph (j)(3) to describe the documents and other information that must be made available to a claimant free of charge upon request after receiving an adverse benefit determination, the regulation provides a specific definition of that term. Subparagraph (m)(8) states that a document, record, or other information is considered "relevant" if it was relied upon in making the determination, or was submitted to the plan, considered by the plan, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the

claimants a window into the denial of their claims, by allowing claimants to compare their denial to up to 50 previous, similar claims that had been adjudicated by the plan.

In announcing the final version of the regulation, the Department of Labor described why its final approach reached the same destination by a better course. Instead of allowing claimants to compare across similar claims, the final version of the rule instead requires plan administrators to put procedural safeguards into place to protect claimants. The Department apparently believed that subparagraph (m)(8)(iii)[3] would provide claimants with "any information that the plan has generated or obtained in the process of ensuring and verifying that . . . the plan

---

determination. Subparagraph (m)(8) further provides that the claimant should receive any information demonstrating that, in making the adverse benefit determination, the plan complied with its own processes for ensuring appropriate decisionmaking and consistency. Additionally with respect to group health and disability claims under subparagraph (m)(8), a document, record, or other information is considered "relevant" if it constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for that claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the determination. The Department believes that this specification of the scope of the required disclosure of "relevant" documents will serve the interests of both claimants and plans by providing clarity as to plans' disclosure obligations, while providing claimants with adequate access to the information necessary to determine whether to pursue further appeal.

Employee Retirement Income Security Act of 1974; Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed. Reg. 70,246, at 70,251-70,252 (Nov. 21, 2000) (emphasis added; footnotes omitted).

3. The parties also disagree over whether this Court's production order rested exclusively upon 29 C.F.R. § 2560.503-1(m)(8)(iv), or upon all the subparagraphs therein ((m)(8)(i-iv)). *See* Opp'n Br. at 8 n.4; Reply Br. at 3 n.2. Slicing the subparagraphs that finely runs the risk of missing the forest for the trees, since the Announcement Memo suggests that the four subparagraphs work together to accomplish a synergistic purpose. To the extent that invoking subparagraph (m)(8)(iii) in this ruling requires me to abrogate or amplify my previous Discovery Ruling, I do so now.

complied with its own administrative processes and safeguards." Announcement Memo at 70,252.

Similarly, the final version of the regulation redefined the scope of a plan's production obligation, so that plans were now required to disclose any document that was "relevant" to a claim. According to the Announcement Memo, subparagraph (m)(8) "provides that the claimant should receive any information demonstrating that, in making the adverse benefit determination, the plan complied with its own processes for ensuring appropriate decisionmaking and consistency." *Id.*

In other words, the Department of Labor believed its revision would address a shortcoming in the previous rule: claimants had been unable to verify whether their plan had followed its own procedures in adjudicating their claim. Plans would now be required to implement "safeguards" against inconsistency, and when a claimant requested information about her own claim, "*any* information demonstrating that . . . the plan complied with its own processes" would be "relevant." *Id.* (emphasis added).

The new regulation also contained language of limitation — the cryptic phrase "with respect to the plan concerning the denied treatment option," and so forth — and the Announcement Memo illuminates that, too. Apparently, commenters representing plans had "expressed dissatisfaction" with the "relevance" standard, "particularly when coupled with the modifier that information need not have been relied upon to be relevant." *Id.* The plans argued that such a standard "would impose an unlimited burden on plans to search their records for any information relevant in the broadest sense to the claim, whether it was in any way related to the actual claims process." *Id.*

The Announcement Memo explains that "[t]he regulation responds to this concern," *id.*, and the only way it can be said to respond is in the mysterious phrase of limitation. It is clear to me that this language of limitation is meant to solve the problem by containing relevancy within the realm of documents, procedures, policies, practices, and so forth, that could possibly apply to a case like the claimant's. The phrase excludes those documents, policies, and procedures which by their own terms could not apply in this instance.

To take a hypothetical example, say MetLife had maintained a set of appeal procedures for claims under plans sponsored by private employers, like defendant Pechiney, and another set of appeal procedures for claims under plans sponsored by public employers, such as the federal government. In this hypothetical, the latter set of procedures could not possibly said to be a "statement of policy or guidance *with respect to the plan*" that covered Kruk. Under MetLife's own terms, such procedures would be reserved for other kinds of plans.

Similarly, in another hypothetical, say that Kruk's own disability plan was governed by different appeal procedures for disabilities stemming from external trauma, and for disabilities stemmed from a pathology that was internal to the individual. If Kruk's disability was indisputably diagnosed to fall within the latter category, then the appeal procedures for the former category could not be said to be "concerning the denied treatment option or benefit for the claimant's diagnosis."

But in either hypothetical, if MetLife maintained certain documents, procedures, policies, or written practices that indisputably applied to *all* of its plans, or to *all* the possible range of treatment options and diagnoses, then those items would be "relevant" in *all* cases.

MetLife cites two cases decided by the same judge in the District of Arkansas for the proposition that an "entire claims manual is not a statement of policy or guidance regarding a claimant's [particular] diagnosis." *Garrett v. Hartford Life & Accident Ins. Co.*, No. 4:07-cv-00065 (JLH), 2007 WL 2274324, at *1, 2007 U.S. Dist. LEXIS 57652, at *2-3 (D. Ark. Aug. 6, 2007); *see also Hughes v. Liberty Life Assur. Co.*, No. 4:07-cv-00694 (JLH), 2008 U.S. Dist. LEXIS 6552, at *2-3 (D. Ark. Jan. 28, 2008) (same). These cases are not squarely on point, because the plaintiff in both of the cases sought the "entire claims manual," without any limitation whatsoever. Insofar as these cases hold that the regulations do not require a plan or its administrator to produce an *entire* claims manual, I agree with that conclusion.

However, insofar as these cases agree with MetLife, that a plan must only produce appeals procedures that *specifically and explicitly refer* to the claimant's particular plan and particular medical condition, such a holding is not faithful to the regulation, and I decline to adopt it.[4] The clear intent of the regulation was to provide a claimant with access to all the procedures that did apply, should have applied, or could have applied in her case — whether or not those procedures explicitly mention her plan or condition or not. In short, any such policy would provide "guidance" to the plan as to how the claim should be administered, regardless of whether the plan followed that guidance.

In this conclusion, I once again find support from the First Circuit's opinion in *Glista v. UNUM Life Insurance Co. of America*, 378 F.3d 113 (1st Cir. 2004). In that opinion, the First Circuit stated that the district court should have considered precisely the kinds of documents that

---

4. I also note — as did plaintiff — that neither of these cases contains any meaningful analysis of the regulation. Both of the rulings, which are almost identical in language on this point, seize upon the regulation's phrase "for the claimant's diagnosis," and conclude erroneously that because the *entire* claims manual is not a manual "for the claimant's diagnosis," then it must be true that *none* of the claims manual should be produced.

plaintiff seeks to discover.[5]  And in that opinion, the First Circuit also looked to the Announcement Memo as an indication of the Department of Labor's intent, before arriving at the same conclusion that I reach today.  *See id.* at 123 (quoting Announcement Memo, 65 Fed. Reg. at 70,252).

The fundamental principle which motivated the current version of the regulation is the same principle that controlled this Court's ruling on plaintiff's original motion to compel: an ERISA claimant is entitled to know which documents and procedures speak to cases like hers, whether or not they were actually followed or relied upon in her case.  The Court quoted the language of limitation from the CFR simply to emphasize that MetLife is not obligated to produce *every* policy or procedure that it maintains — only those that could be said to affect her case, whether or not they did.

### III.  Plaintiff's Motion for Sanctions

In her Supplemental Motion, Kruk also asks this Court to sanction MetLife for its refusal to produce the Claims Management Guidelines.  *See* Mot. [doc. #45] at 4.  MetLife responds that "MetLife has consistently represented that it has general claim handling procedures in the CMG," and that its position was "justified in light of the authorities cited" in its opposition to the supplemental motion to compel.  Def.'s Opp'n at 9-10 n.6 (citing Fed. R. Civ. P. 37(b)).

Lawyers are paid to parse language closely, and to advocate their client's position zealously.  While I doubt that MetLife's lawyers suffered any misconceptions about the thrust of the Discovery Ruling, I cannot fault them for attempting to squeeze through loopholes that may

---

5.  As I noted in the discovery order, it follows that if the district court should have considered this evidence in its review for arbitrariness and capriciousness, then a plaintiff clearly must be entitled to discover that type of evidence first.  2009 WL 1481543 at *5, 2009 U.S. Dist. LEXIS 46454 at *18.

be of my own making. Furthermore, plaintiff fails to rebut MetLife's arguments on this subject in her reply brief. In light of the textual ambiguity that I have already discussed, I find that imposing an award of expenses or some other sanction would be "unjust," Fed. R. Civ. P. 37(b)(2)(C), and I decline to do so.

### IV.     Plaintiff's Request To Extend Discovery To Depose Drs. Payne and Givens

The Discovery Ruling permitted Kruk to take limited depositions of the physicians that MetLife consulted on her case, provided that the inquiry should be limited to the issue of whether such physicians faced a conflict of interest that would call their medical evaluations into question. MetLife was ordered to cooperate to the extent the consulting physicians were under its control.

On July 29, 2009, MetLife informed Kruk that the physicians MetLife consulted on her claim — Drs. Payne and Givens — were not under MetLife's control. About a week later, Kruk's counsel informed MetLife that he intended to issue subpoenas as to those individuals, but never did. *See* Def.'s Mem. [doc. #48] at 5-6; E-mail from Jeffrey Sklarz to Theodore Tucci & Michael J. Kolosky, Def.'s Mem. ex. 3 (Aug. 6, 2009). Kruk's attorney sought to take the deposition of Sharon Muldrow, the MetLife appeals adminsitrator, "during either the week o[f] August 17th or 24th." *Id.* Because discovery was scheduled to close on September 30, 2009, taking Muldrow's deposition during late August would have given plaintiff another month before the close of discovery to take depositions of Drs. Payne and Givens. Muldrow was finally deposed on September 24, 2009. Six days later, at the close of discovery, Kruk filed the motion that is now before the Court.

In her motion, Kruk seeks to extend the discovery period "until thirty (30) days after MetLife's full discovery compliance. The Plaintiff needs to depose the 'vendor coordinator'

assigned to this matter and the doctor assigned to review the Plaintiff's claim to determine whether there was a 'departure from the standard procedures for determining LTD benefits....'" Mot. at 3 (quoting Discovery Ruling; ellipsis in original). MetLife responds that Kruk has not demonstrated good cause for her failure to depose Drs. Payne and Givens within the Court's deadline, and she "utterly fails to demonstrate that a vendor coordinator has any substantive input regarding the claim determination at issue in this case." Opp'n Br. at 10. In her reply, Kruk argues that "[t]he deposition of Dr. Payne was not noticed because the deposition of Ms. Muldrow had to be completed first and due to ***her's and MetLife's requests***, said deposition could not be scheduled until but a few days prior to the" close of discovery. Reply [doc. #50] at 8 (emphasis in original). Kruk makes no additional arguments why a "vendor coordinator" must be deposed, other than to say that she first learned of that position's existence during Muldrow's deposition, which occurred four days prior to the close of discovery.

As to Drs. Payne and Givens, Kruk has given no reason to support her blanket assertion that "the deposition of Ms. Muldrow had to be completed first." *Id.* The Discovery Ruling had already limited those depositions to two issues — "whether this case constituted a departure from the standard procedures for determining LTD benefits, and . . . whether the personnel have a relationship with MetLife or Pechiney that would call their medical evaluations into question." 2009 WL 1481543 at *8; 2009 U.S. Dist. LEXIS 46454, *25-26. If logic or strategy required Muldrow to be deposed first, that was surely not a revelation that came to light at her deposition on September 24, 2009. Kruk has not provided good cause why she failed to depose these doctors within the original deadline.

As for the vendor coordinator, it seems highly unlikely that this newly discovered individual could offer evidence that would be relevant under the limited inquiry permitted by the Court's prior Discovery Ruling. According to Muldrow's testimony, the vendor coordinator was "the person that all of the referrals go to," and the only role of the Vendor Coordinator was to "refer the file out based on the specialties that may be needed." Muldrow Dep'n, Opp'n ex. 4, at 24. Clarifying, she said that the vendor coordinator was the individual who "sets [] up" the "medical review pursuant to the policy." *Id.* at 25. When asked more about interactions between MetLife and its independent consulting physicians, Muldrow explained:

> Q. Who has interaction with the doctor?
>
> A. The vendor.
>
> Q. How about the vendor coordinator?
>
> A. I don't know.

*Id.*

Even if the vendor coordinator had interactions with the doctors, Kruk has not pointed to any other information obtained during Muldrow's deposition to suggest that the vendor coordinator could shed light on how this case might constitute a departure from the standard procedures for determining LTD benefits. Similarly, Kruk has not explained how the vendor coordinator could illuminate whether the vendors or doctors themselves "have a relationship with MetLife or Pechiney that would call their medical evaluations into question." Discovery Ruling at 16. On this record, Kruk has not met her burden to show that the discovery she seeks is "relevant" — that is, that it is "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

In sum, I see no reason to extend the close of discovery in this case to permit further depositions.

**V.      Conclusion**

Plaintiff's Supplemental Motion To Compel is GRANTED in part and DENIED in part. MetLife must produce relevant portions of its Claims Management Guidelines as described *supra*, within 30 days of this Order. The request for sanctions pursuant to Fed. R. Civ. P. 37(b) is DENIED. Likewise, the motion to extend the discovery period to permit further depositions is DENIED.

Dispositive motions must be filed within 75 days of this Order.

It is SO ORDERED.

Dated:  New Haven, Connecticut
             May 27, 2010

                                                                 /s/ *Charles S. Haight, Jr.*
                                                                 Charles S. Haight, Jr.
                                                                 Senior United States District Judge