## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **RITA KRUK,** | : | |
| | : | **CIVIL NO. 3:07-cv-1533 (CSH)** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **METROPOLITAN LIFE INSURANCE** | : | |
| **CO., INC. and PECHINEY PLASTIC** | : | |
| **PACKAGING, INC.,** | : | |
| | : | **MARCH 13, 2013** |
| **Defendants.** | : | |

### RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge**:

This is an action arising out of a denial of long term disability benefits, brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. The plaintiff, Rita Kruk, alleges that the defendants, Pechiney Plastics Packaging, Inc. ("Pechiney") and Metropolitan Life Insurance Company, Inc. ("MetLife"), denied her long term benefits for which she was qualified, in violation of ERISA.

After discovery, the defendants now move under Rule 56, Fed. R. Civ. P., for summary judgment dismissing the complaint. Plaintiff opposes that motion. This Ruling decides it.

### I.  BACKGROUND

In or around December of 1994, defendant Pechiney hired plaintiff Kruk to work as a Human Resources Specialist. By reason of that employment, Kruk became a participant in an employee

1

welfare benefit plan ("the Plan").  The Plan is covered by and subject to the ERISA statute.

Pechiney is the Plan administrator, funds the benefits under the Plan, and retains final authority for the Plan and its administration.  Defendant MetLife is the claims administrator for the Plan, with the discretion to resolve benefit eligibility issues, including administrative appeals by employees who have been denied benefits during the process.  Pechiney delegated to MetLife "the discretionary authority to determine the rights, eligibility and benefits of participants and beneficiaries" in respect of benefits under the Plan.  The Plan provides benefits for short term disability ("STD") and long term disability ("LTD").

In December 2000, Kruk submitted to MetLife a claim for LTD benefits.  To be eligible for long term disability benefits, the Plan requires Kruk to demonstrate that she is "totally disabled." Under the Plan an employee is considered totally disabled if:

> For the first two years of [the participant's] long term disability period, the [participant is] unable to perform the major duties of [the participant's] job with Pechiney.
>
> After two years, [the participant is] totally and permanently disabled and unable to perform any job for which [the participant] is qualified by education, training, or experience.

The Plan also provides that participants receive monthly LTD benefits up to age 65 if the disability is due to physical injury or illness.  If the disability is due to a mental or emotional disease, the Plan provides participants with monthly LTD benefits for a maximum of 24 months.

MetLife initially approved Kruk's claim, but then reconsidered the matter, conducted some further medical inquiries, and on October 1, 2001, denied her claim for LTD benefits.  In 2003, Kruk filed an ERISA action in this Court against Pechiney and MetLife.  The case, assigned to District Judge Covello, bore docket number 3:07-cv-1533.  After trial, a jury ruled in Pechiney's favor.

Judge Covello, sitting as a Chancellor in Equity, held that "MetLife arbitrarily and capriciously denied the plaintiff long time disability benefits for which she may have been entitled." Memorandum of Decision filed December 27, 2004 [Doc. 144] at 1.  Judge Covello's order remanded the case "to MetLife for a new eligibility determination with consideration to be given to information that should have been made part of the administrative record, that is, Dr. Witt and Dr. Tec's responses" to MetLife's further information requests. *Id.* at 8-9.  Dr. Witt (an internist) and Dr. Tec (a psychiatrist) were Kruk's treating physicians.

Following remand, MetLife made further medical inquiries and obtained physicians' opinions. Kruk submitted additional information. As a result of these further proceedings, including another administrative appeal, MetLife changed its position with respect to Kruk's entitlement to LTD benefits.  Kruk had instituted the earlier action before Judge Covello because MetLife had denied her claim for long term disability benefits in its entirety.  MetLife now approved Kruk's claim for long term disability payments insofar as that claim was based upon her mental and emotional condition.  MetLife adhered to its denial of LTD benefits based upon a physical illness or impairment.

As a result of that revised conclusion, MetLife undertook to calculate the amount Kruk was owed under the Plan for 24 months of LTD, that being the maximum amount of time available for disability caused by a mental or emotional disease.  In Kruk's case, MetLife calculated that the period January 19, 2001 to January 18, 2003 comprised the full extent of Kruk's LTD benefits entitlement, resulting in a base benefits amount of $136,214.40, from which MetLife withheld $36,257.59 in federal and state income taxes, resulting in a net amount of $99,956.81, which MetLife paid to Kruk on May 31, 2010.

MetLife regards itself as having complied fully with the Plan, since in its view Kruk has not proved herself eligible for long term disability benefits based upon physical causes. Kruk does not accept the termination of LTD benefits because she contends that she is totally disabled by a rheutmatological and autoimmune physical disease: lupus. Having lost patience with MetLife during the remand, in 2007 Kruk filed this second ERISA action against MetLife and Pechiney to enforce a renewed claim for long term disability benefits.

Both defendants move for summary judgment. MetLife takes the laboring oar in the briefing. Pechiney's brief, of the "me too" variety, is content to echo MetLife's factual and legal assertions, without elaboration. Kruk opposes both motions. She has not filed a cross-motion for a summary disposition; her contention is that the case must be tried.

## II.   DISCUSSION

### A.   Standards of Review

In *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75 (2d Cir. 2009), the Second Circuit made it plain that in an ERISA action, a district court applies the familiar and established standard: "Summary judgment is appropriate only where the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Hobson*, 574 F.3d at 82 (citing and quoting *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002)).

With respect to the merits of the case, this Court may not disturb MetLife's ultimate conclusion of non-entitlement to benefits unless a review of the administrative record shows that conclusion to be arbitrary and capricious: an issue upon which Kruk bears the burden of proof and

persuasion.  The "arbitrary and capricious" standard of review is firmly established by the Second

Circuit in *Hobson*, based upon its analysis of the Supreme Court's decision in *Metropolitan Ins. Co.*

*v. Glenn*, 554 U.S. 105 (2008), and its own earlier decisions in *Pagan v. NYNEX Pension Plan*, 52

F.3d 438, 441 (2d Cir. 1995) and *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir.

2008).  *See Hobson*, 574 F.3d at 82-83.

Shaped by these authorities, a district court's standard of review in this frequently

encountered sort of ERISA benefits-plan case may be summarized thus: The court first considers

the administrative record upon which the plan administrator denied a participant's claim for disability

benefits.  (There are circumstances where evidence from sources outside the administrative record

may be considered).  Generally, an administrator's decision to deny benefits is reviewed by the court

*de novo*.  However, where a plan's governing documents confer upon a plan administrator the

discretionary power to determine eligibility, at initial and appeals stages, the court will not change

or disapprove the administrator's decision unless it constituted *an abuse of discretion*, a noun

invariably defined by the pejorative adjectives *arbitrary* and *capricious*.

The case at bar involves such an arrangement: Pechiney, the employer, originator and funder

of the Plan, conferred the relevant discretion upon MetLife, its administrator.  Even where an

insurance company like MetLife both evaluates and pays benefits claims of an employer's employee-

participants, thereby creating a recognized conflict of interest (which does not appear to be the fact

in this case), a *de novo* review by the court is neither appropriate nor undertaken.  "A plaintiff's

showing that the administrator's conflict of interest affected the choice of a reasonable interpretation

is only one of several different considerations that judges must take into account when reviewing the

lawfulness of benefit denials." *Hobson*, 574 F.3d at 83 (internal quotation marks omitted).  Note the

Second Circuit's qualified phrase "*reasonable* interpretation": an interpretation which in the totality of circumstances is *unreasonable,* consequently arbitrary and capricious, and cannot form the basis for a denial of benefits.

In Kruk's earlier action before Judge Covello,  she proceeded and succeeded on an arbitrary and capricious theory. Judge Covello remanded Kruk's disability claim to MetLife because he concluded that MetLife as claims administrator had acted arbitrarily and capriciously in failing to follow up on inquiries to Kruk's treating physicians after saying it would do so.  Thus, Judge Covello's ruling did not reach or implicate the merits of Kruk's underlying claim.

After remand, MetLife acquired and received additional medical information and evidence on the existence *vel non* of a condition rendering Kruk totally disabled.  MetLife decided that Kruk was disabled by a mental or emotional condition, paid Kruk the 24-month maximum benefits the Plan provided for such a disability, and further decided that the medical evidence did not support Kruk's claim that she was disabled by a physical cause.

In this second ERISA action, Kruk challenges that decision.  In their brief, counsel for Kruk seem to abandon their earlier acceptance of the arbitrary and capricious standard, arguing that instead the Court should submit the administrative record to *de novo* consideration.  Kruk's brief [Doc. 71] at 12 contends that MetLife's sins of omission and commission are so grave, its fall from grace so precipitous, MetLife has forfeited the more deferential standard of abuse of discretion, and "this Court should review the case *de novo* or, alternatively, at a minimum take into consideration MetLife's conduct and omissions both leading up to the *Kruk I* decision and MetLife's actions thereafter."

I decline this invitation to substitute a *de novo* review for the abuse of discretion *cum*

6

arbitrary and capricious standard when I come to judge MetLife's denial of Kruk's claim for LTD benefits.  The law of this Circuit is committed to the arbitrary and capricious standard when courts review decisions of claims administrators of employee benefit plans vested with discretion to allow or deny claims.  That rule is established by an unbroken line of cases, *Hobson* being one of the more recent.  The administrator may have conducted itself in serial inappropriate ways: arbitrary and capricious remains the standard of review.  In *Winkler v. Metropolitan Life Ins. Co.*, 170 F. App'x 167 (2d Cir.  2006), the administrative record on which MetLife based its decision not to qualify an employee as disabled under a benefits plan was littered with instances of MetLife's unfair conduct, exemplified by the court of appeals' comment at 170 F. App'x 168: "An administrator may, in exercising its discretion, weigh competing evidence, but it may not, as MetLife did here, cherry-pick the evidence it prefers while ignoring significant evidence to the contrary."  The cumulative effect of MetLife's several departures from fair administration of Winkler's claim created in the Second Circuit's eyes "the overall picture of its decision as less than fair," *id.*, which consequently the court of appeals vacated.

As to the proper standard of judicial review, the Second Circuit said in *Winkler*:  "We assume arguendo that the more deferential 'arbitrary and capricious' standard applies because we find that MetLife's determination fails even this deferential review." 170 F. App'x at 168.  That language may be read to suggest that in certain undefined circumstances, the less deferential standard of *de novo* review might be applied.  However, the claimants' criticisms of MetLife in *Winkler* resemble in number and nature Kruk's criticisms of MetLife in the case at bar, and I will perform the same analysis: including MetLife's administrative shortcomings, to the extent demonstrated, in the calculus of determining whether, in the totality of circumstances, MetLife's decision to deny Kruk long term

disability benefits was arbitrary and capricious, and consequently "less than fair."

**B.**     **The Particular Dispute in This Case**

The briefs of counsel identify the particular dispute upon which this case turns.  Unlike many ERISA cases, the dispute is not about whether a plaintiff benefits claimant is in fact *disabled*.  The parties dispute *the medical cause* of Kruk's disability.  MetLife decided that Kruk was disabled by mental and emotional conditions, and paid her 24 months' worth of disability benefits.  Those payments ceased because that was the Plan limit for those conditions: not because MetLife concluded Kruk had been cured of them.  Kruk's present claim is she is disabled by lupus, a physical cause for which benefits are payable until she is 65 years of age.  MetLife's present response is that Kruk's disabling conditions are ascribable to mental and emotional depression, not to the physical illness of lupus.

The briefs of counsel contain the following quoted passages (all emphases are added) which give voice to the parties' core contentions.  "Defendant's Briefs" refers to MetLife's briefs; Pechiney submitted none of any substance.

**1.**     **Plaintiff's Brief**

Drs. Witt and Kagan both believed Kruk was disabled *on account of lupus* and their contemporaneous office records support their respective diagnoses.  Brief [Doc. 71] at 20.

Dr. Schoen explains that the laboratory and clinical finds are the best measure of *whether Kruk has disabling lupus . . . . Id.*

[A] question of fact exists as to whether MetLife considered all available and relevant evidence when it denied Kruk's claim for LTD benefits *on account of disabling lupus*.  *Id.* at 22.

In this case, Drs. Witt, Kagan and Schoen *attribute Kruk's disability*

8

*to lupus.  Id.* at 28.

**2.**      **Defendant's Briefs**

The dispute here centers around plaintiff's allegations that her disabling symptoms are based on *a physical, specifically rheumatological, disability.*  Main Brief at 16.

Plaintiff failed to submit medical records supporting her claim that she is disabled by lupus.  Instead, those records show that Plaintiff's functional limitations *are related to her depressive disorder.*  Reply Brief at 1.

The medical documentation on which Plaintiff relies instead demonstrates that her functional limitations *are caused by depression – not lupus.  Id.* at 2-3.

With the battle lines thus drawn, the Court turns, as courts invariably do in cases of this nature, to the medical evidence contained in MetLife's administrative record, which MetLife purportedly considered in arriving at its decision adverse to Kruk's present claim for long term disability benefits.

**C.**      **The Medical Evidence**

The Introduction to Kruk's brief in opposition to summary judgment [Doc. 71] begins by declaring: "Kruk has suffered from debilitating lupus since at least January 2001."  This arresting sentence, fashioned to get the reader's attention and begin the process of persuasion, is an exercise in advocacy, not medical evidence.  The admissible sources of medical evidence in the case are reports and notes compiled by physicians who treated Kruk, or examined her, or reviewed the files concerning her, on behalf of one party or another.

The Court prefaces its consideration of that medical evidence with the observation that Rita Kruk is one of those good people – honorable, law-abiding, a wife and mother, with the abilities

required by a responsible executive position – who has been plagued by ill health for years.  At one

level, in one particular context, it must be adjudged that life's treatment of Kruk has been unfair.  But

that is neither the level nor the context of this action.  This action, governed by principles of law,

ultimately turns upon the question: Can Kruk prove that the physical disease of lupus is the cause

of her disability?  As framed by MetLife's motion for summary judgment, the question becomes: Is

MetLife entitled to judgment as a matter of law that its contrary decision does not constitute an abuse

of the discretion conferred upon it by the Pechiney employee disability Plan?

In 1995, Kruk was employed by Pechiney as its human resources director.  At about that

time, she came under the care of Leon Tec, M.D., a psychiatrist.  In support of Kruk's claim of

disability, Dr. Tec sent a letter to MetLife dated August 24, 2005, Pl. Ex. G, which stated that Kruk

"is unable to function because of her psychiatric and her physical disabilities."  Dr. Tec says that "I've

been treating Rita Kruk since 1996, because of severe chronic depression," and also states:

> Her depression is complicated by her physical disabilities.  Dr. David
> Witt's report indicates that her physical condition is deteriorating
> further, as exemplified by the symptoms he reports, which are
> extreme fatigue, anemia and arthritic pain, which aggravate her
> depression.  Minimal stress disrupts whatever minimal function she
> still had even after taking her physical disabilities (which themselves
> are reported to be totally disabling) into account.[1]

The reference in Dr. Tec's letter is to David Witt, M.D., an internist who was also treating

Kruk.  Dr. Tec's description of Kruk's "physical condition" is apparently based upon a letter dated

September 8, 2004, Pl. Ex. O, that Dr. Witt sent to counsel for Kruk.  Dr. Witt advises that

---

[1] Dr. Tec's parenthetical reference to a report of "totally disabling" physical disabilities cannot be read as part of his own findings, since Dr. Tec's examinations and treatment of Kruk were confined to psychiatric aspects of her condition.  Medical evidence of Kruk's physical condition comes from other sources, discussed in this Ruling *passim*.

> since 2001, when I provided responses to MetLife regarding her
> condition, Ms. Kruk's symptoms and condition have not improved,
> but have actually deteriorated. She continues to experience extreme
> fatigue, anemia and arthralgia and she continues to be incapable of
> managing her affairs on a daily basis . . . . In addition, Ms. Kruk has
> an inability to concentrate for long periods, and this lack of
> concentration is exacerbated by stress.

In these letters, written in support of Kruk's claim, Drs. Tec and Witt, her treating physicians,

each express the opinion that Kruk is totally disabled and her disabilities are permanent. Neither

letter refers to lupus as a cause of those disabilities.

In June 2000, a Dr. Michael J. Wolk referred Kruk to Lawrence J. Kagen, M.D., a

rheumatologist at the Hospital for Special Surgery in New York City, "because of weakness, a

positive ANA and a rising sedimentation rate." Kagen Report on consultation dated June 21, 2000,

Pl. Ex. I. The "ANA" is a blood test used in the evaluation of possible lupus or other connective

tissue disorders. The WebMD site on the internet, quoted in MetLife's main brief at 5 n.6, says:

"When the ANA is positive, it indicates that someone may have an autoimmune disorder, but alone

it can't make the diagnosis." After examining Kruk, Dr. Kagen noted his "impression": "Rule out

connective tissue disorder (?) orthostatic hypotension." Lupus is one of several connective tissue

disorders. I take the phrase "orthostatic hypotension" to refer to a possible cause for physical

weakness and losses of consciousness; according to his report, Kruk told Dr. Kagen she had been

experiencing episodes of weakness and dizziness since she was age 19 (she was 47 at the time of this

consultation).

Dr. Kagen recommended that Kruk undergo a series of additional tests, which his subsequent

notes indicate were performed. Under date of August 8, 2001, Dr. Kagen sent a letter addressed "to

whom it may concern" (presumably counsel for Kruk) which states in part:

11

> In response to your inquiry, she [Kruk] is capable of walking about one hour a day and capable of sitting during the day about that time. This condition is expected to last more than 12 months and the diagnosis of Lupus is not absolutely confirmed.

The first appearance of the word "lupus" in the administrative record seems to occur in one of several documents generated by Kruk's initial claim for long term disability benefits.  That claim form, comprising Bates page numbers 47 and 48 of the administrative record,[2] is dated December 11, 2000, recites that Kruk was first disabled "by this sickness or injury" on July 28, 2000 and is unable to return to her job at Pechiney.  Dr. Tec filled out an "Attending Physician's Statement of Functional Capacity," Ad. R. 52-53, which recited *inter alia* that Kruk's symptoms first appeared on July 10, 2000; her first visit to Dr. Tec (presumably, related to that sickness) was July 12, 2000 and the most  recent examination was January 9, 2001.  The form identifies the "primary diagnosis affecting work ability" as "Depression," and lists under "any secondary diagnosis affecting work ability" the following: "Anemia, Hematologic Disorder, Antinuclear Antibody - Positive, Immunologic Disorder. Patient subject to abnormal blood clotting problems."

A MetLife Daily Review Report, Ad. R. 54-64, includes notes of "R. Lombardi," an RN, who interviewed Kruk on  January 24, 2001.  Kruk described her symptoms and medical history to Lombardi, who recorded in her notes that Kruk "was on her way out to see a rheumatologist in NYC.; said they are suspecting possible lupus."  I find from the evidence that the "rheumatologist in NYC" was Dr. Kagen, who had previously recorded his impression "Rule out connective tissue disorder (?)" in his report dated June 21, 2000, but had not yet advised counsel, as he did on August 8, 2001, that after further tests "the diagnosis of Lupus is not absolutely confirmed."  It is probably

---

[2]  Subsequent citations to the administrative record will be designated  "Ad. R."  and  give the Bates page numbers.

unnecessary to add that Kruk's reference to "possible lupus" during her interview with Lombardi has no independent probative value as medical evidence.

In 2006, counsel for Kruk retained Robert T. Schoen, M.D., a professor at Yale Medical School and a rheumatologist in private practice, to review Kruk's medical records and examine her, "for the purpose of disability evaluation" (quoting the first paragraph of Dr. Schoen's written report to counsel dated October 1, 2006, Pl. Ex. T). MetLife had initially denied both of Kruk's asserted grounds for long term disability benefits: her psychiatric condition, and her physical condition. That total denial prompted Kruk's first action in this Court. Following the remand from Judge Covello in 2004. During 2005 MetLife obtained the opinions of two "independent physician consultants," in MetLife's nomenclature: Reginald A. Givens, M.D., a psychiatrist, and D. Dennis Payne, Jr., a rheumatologist. Dr. Schoen's report focuses primarily upon the opinion of Dr. Payne, his colleague in the specialty of rheumatology, but Dr. Schoen also takes some shots at Dr. Givens, the psychiatrist MetLife consulted.

Dr. Schoen's report describes his examination of Ms. Kruk, states his Conclusion in a paragraph on page 3 of Pl. Ex. T, and then sets forth his reasons for that Conclusion. Dr. Schoen's Conclusion reads as follows:

> In my opinion, Mrs. Rita Kruk has total and permanent disability as result of connective tissue disease (systemic lupus erythematosus) and depression. This disability was present as of July 2000. She has objective laboratory testing to support the diagnosis of systemic lupus erythematosus or a related entity, connective tissue disease. These diagnoses and her severe depression explain her fatigue, arthralgias and her disability from work as outlined in the reports of both Dr. Witt and Dr. Tec.

Dr. Schoen's report next sets forth a table of laboratory tests performed during the period

1997-2006 which he captions "Rita Kruk: Abnormal Rheumatology Tests." He then gives reasons for criticisms of the opinions of Dr. Givens and Dr. Payne.  As for the psychiatric aspect of the case, Dr. Schoen notes Dr. Payne's acknowledgment that Kruk has "features of major depression and anxiety," and contrasts it with Dr. Givens's conclusion that "[f]rom a psychiatric perspective . . . there was insufficient objective evidence to support significant impairments."  This moves Dr. Schoen to say disapprovingly that Dr. Givens "disagrees not only with Dr. Tec, Mrs. Kruk's treating psychiatrist who has followed her for ten years, but also with Dr. Payne, the other MetLife appointed physician consultant." Pl. Ex. T at 4

MetLife reacted to those comments of Dr. Schoen by retaining another independent psychiatrist, Kenneth G. Busch, M.D., to reevaluate Kruk's psychiatric condition.  Dr. Busch reviewed Kruk's medical records, and found in Dr. Tec's notes documentation of an anxiety disorder present in 1996 which degenerated into severe depression by 2000.  Dr. Busch concluded that Kruk "would not have been able to concentrate or focus on her job duties as a Human Resource Specialist beyond 07/19/00 through the last medical information from Dr. Tec in his letter dated 09/23/06." Ad. R. 890.  Based on that opinion of Dr. Busch, which Dr. Schoen's report had prompted, MetLife withdrew its prior denial of all long term disability benefits, and approved Kruk's claim for LTD benefits based on her mental/emotional condition.  As noted *supra*, MetLife has now paid those benefits to Kruk, in the total amount MetLife calculated – a calculation which, as we shall see, is not entirely free from question.

Turning now to Kruk's asserted disability caused by her physical condition, Dr. Schoen's report is critical of Dr. Payne's opinion.  The thrust of Dr. Schoen's criticism in that regard is that Dr. Payne misread or failed to understand the contents and import of the laboratory tests performed on

Kruk over the years.  After quoting Dr. Payne's summary of the laboratory evaluations he examined, Dr. Schoen says briskly: "Actually, this is not correct.  Laboratory evidence to support the diagnosis of systemic lupus erythematosus or connective tissue disease is much more extensive in the records as follows:" The table of tests is then set forth in Dr. Schoen's report.  Dr. Schoen's report says of those laboratory records:

> Mrs. Kruk has fatigue, arthralgias, multiple autoantibodies documented in the table suggesting either systemic lupus erythematosus or, more generally, poorly differentiated connective tissue disease.  The consistent finding of a positive antinuclear antibody over time supports this diagnosis.  Mrs. Kruk has multiple other antibodies not referenced in the MetLife denial letter of January 20, 2006, including positive anti-cardiolipin antibodies, positive lupus antibody APTT, positive hexagonal phospholipid PTT (both compatible with antiphospholipid syndrome, a hematologic disorder frequently seen in lupus patients) and positive double stranded DNA antibodies found on June 22, 2000 at the Hospital for Special Surgery (an autoantibody highly specific for systemic lupus erythematosus) and multiple positive Sm/RNP antibody tests.

Dr. Schoen interprets those laboratory reports by saying:

> Mrs. Kruk has objective laboratory evidence of systemic lupus erythematosus.  Her fatigue and arthralgias are also consistent with this syndrome and with her severe depression.

He is critical of MetLife's prior use of Kruk's "failure to meet the 1982 revised American College of Rheumatology SLE criteria as justification for their denial of benefits," since these criteria "were intended to be used mainly for the purpose of classifying patients in clinical epidemiologic, therapeutic and pathogenic studies of SLE, not as rigid diagnostic guidelines."[3]  Dr. Schoen concludes his report in this manner:

---

[3]  Schoen Report, Pl. Ex. T. Page 4 (footnotes and internal quotation marks omitted). "SLE" stands for systemic lupus erythematosus.

> Thus, in my opinion, Mrs. Kruk has been disabled since July 2000 by her depression and by connective tissue disease, most probably systemic lupus erythematosus, the latter diagnosis based on multiple abnormal autoantibodies supportive of this diagnosis in a patient with characteristic clinical features.

Kruk's counsel submitted Dr. Schoen's report to MetLife, as further support for Kruk's disability benefits claim.  MetLife passed it on to Dr. Payne, the rheumatologist whose earlier evaluation of Kruk played a part in MetLife's denial of Kruk's claim of a disability caused by physical disease.  MetLife asked Dr. Payne to update his evaluation, in the light of Dr. Schoen's report.  Dr. Payne complied.  Both his reports are included in the administrative record.  It is necessary to consider them both.

Dr. Payne's first report is dated November 21, 2005, and appears in the administrative record at Ad. R. 900-904.  His second report is dated March 29, 2007.  Ad. R. 896-899.  Each report consists of a list of medical records Dr. Payne reviewed, Dr. Payne's "rheumatology assessment" based on those records (Dr. Payne did not examine Kruk), and his answers to specific questions posed to him by MetLife.  Ad. R. 895-899.  On both occasions, Kruk's medical records were referred to Dr. Payne "for review to determine Rita Kruk's level of functionality."  Ad. R. 901; Ad. R. 896. *Functionality* is a logical inquiry for MetLife to direct to a physician, since the Plan MetLife administered paid benefits for *disability.*  These nouns form the two sides of the same quality-of-life coin: as functionality lessens, disability increases, and vice-versa.[4]

The medical records concerning Kruk which Dr. Payne examined for his first report included those generated by Dr. Tec and Dr. Kagen, to whom prior reference has been made, as well as a

---

[4] A student of words may also reflect upon the cruel oxymoron inherent in the phrase "disability benefits."

16

number of laboratory test results.  Dr. Payne begins that report by saying:

> This is a medical review in regards to a long term disability determination on Rita Burrock-Kruk.  Specifically, the case is being reviewed in regards to the diagnosis of rheumatic disease.

Ad. R. 902.  Dr. Payne then observes that Kruk has "a history of several conditions mentioned in the medical record," and goes on to says:

> These include a history of severe depression, anemia, a questionable seizure disorder, and systemic lupus or possibly mixed connective tissue disease.  In reviewing the entire medical record presented, the depression is suggested to have been the overriding problem over the past years.  The diagnoses of anemia, the seizure disorder, and the connective tissue process are seen in the medical record insidiously over the five years of data presented to me.  In reviewing the records of follow-up from the psychiatrist there are findings of the depression, anxiety and cognitive impairment characterized difficulty concentrating and memory.  Also described are anxiety episodes, fatigue, sleep disturbances, and large degree of psychosocial stressors including marital discord.

*Id*.  Turning specifically to indications in the medical record of rheumatic disease, Dr. Payne's first report says:

> There are reports of widespread arthralgias without clear swelling, redness, or warmth of the joints being described.  There are no reports of destructive joint changes on exam or in imaging data.  No functional impairments of the musculoskeletal system are documented objectively in the medical record.  Specifically, minimal features of a systemic inflammatory rheumatic disease are documented on examination.  There is no evidence of photosensitivity, oral ulcers, alopecia, or significant pleuropericardial disease that is objectively present.  There is no evidence of clear CNS manifestations of a systemic rheumatic process.  Mention is made of a "seizure disorder" but the description thereof is nonspecific and more in keeping with anxiety.  No hematological manifestations of lupus are present.

*Id*.

As for Kruk's laboratory tests, Dr. Payne's first report says: "Within the medical record is an extensive array of laboratory evaluations.  These are all essentially unremarkable except for a positive ANA at 1:640 spindle and smooth patterns of immunofluoresence."  Ad. R. 902.    Dr. Payne comments briefly on other laboratory evaluations he regarded as "unremarkable," and then states his conclusions at Ad. R. 903: conclusions that take the form of the last two paragraphs of the main body of his report, and his answer to the first specific question posed on the form submitted to him:

> On reviewing the available medical record, Ms. Burrock-Kruk's clinical course has been one characterized primarily by continued features of major depression with anxiety.  These features have been associated with nonspecific cognitive complaints more in keeping with the affective disorder.  Treatment has primarily been directed toward control of the depression and anxiety with antidepressants, benzodiazepines, and tricyclics.  There is mention of the use of anti-inflammatories and hydroxychloroquine; no mention of objective improvements is described from these treatments.  A diagnosis of any form of systemic inflammatory rheumatic disease is not supported in the medical record.

> The objective medical record does not support a diagnosis of lupus or any other systemic inflammatory rheumatic disease.  In addition, there is no evidence of a systemic rheumatic disease that is causing any degree of functional impairment from any employment.

>        *     *     *     *     *

> The medical record does not support any degree of functional impairment from any systemic rheumatic disease.  Specifically, a diagnosis of lupus or any related disorder is not supported by the objective medical data presented.

Counsel for Kruk included this report from Dr. Payne in the medical records submitted to Dr. Schoen for review, and as we have seen, Dr. Schoen's report was critical of Dr. Payne's.  MetLife

passed Dr. Schoen's report on to Dr. Payne, together with additional laboratory test results, and asked

him to again review the expanded file to determine Kruk's "level of functionality."  That request

produced Payne's second report, dated March 29, 2007, Ad. R. 896-899.

Dr. Payne begins his second report by noting that on March 26 he telephoned Dr. Schoen's

office to attempt to arrange a teleconference about Kruk's condition.  In a manner Dr. Payne

described as "very gracious," Dr. Schoen told Dr. Payne that, in the circumstances, Dr. Payne

"needed to obtain permission both from Ms. Kruk and her legal counsel prior to performing a

teleconference." Ad. R. 897.  So far as appears from the record, Dr. Payne made no further effort

to arrange a teleconference with Dr. Schoen; he submitted his second report three days later.  Dr.

Payne's second report, which consists primarily of a response to the report of Dr. Schoen, contains

the following:

> This case has been reviewed in the past by me in November 2005.
> Subsequent to that, more medical records have become available and
> I have been able to review this data.
>
> One item is a consultation with Dr. Robert Schoen who is professor
> rheumatology [*sic*].  I was able to review his medical record data
> regarding Mrs. Burrock-Kruk.  His opinion was that she definitely did
> have a lupus-like phenomenon.  He based this upon her constellation
> of clinical findings in the setting of her laboratory abnormalities.
>
> Additional data I had reviewed with regard to workup information
> includes some other sub serological findings that were not previously
> available for me in November 2005 on my initial review.  These
> include the fact that she was positive for an IgM and IgG
> anticardiolipin antibody.  The positives were slight but present.  In
> addition, she was found to have a positive double standard DNA.
> Also positive were the Smith antibody and she had an ESR of 31.
> There are some other additional that reveal a negative double stranded
> DNA.
>
> Additional examination findings in the record submitted are

> essentially unchanged from before.  There are no specific clinical
> features of SLE or other systemic rheumatic conditions present that
> would be expected to be producing restrictions or limitations on
> activity.  There are no specific cardiac, pulmonary, gastrointestinal,
> or neurological findings that would be considered restricting or
> limiting.

Ad. R. 897.    These observations led Dr. Payne to express the following conclusions, in response

to questions posed on the form submitted to him:

> At present time, following a complete and thorough review of the
> additional medical record data, my determination is unchanged; Mrs.
> Burrock-Kruk is capable of unrestricted work.

> *        *        *        *        *

> At the current time, in reviewing all of the medical record data,
> including the initial submitted data as well as the additional submitted
> medical record data, Mrs. Burrock-Kruk does have serological
> findings that are quite abnormal.  Further, they are specific for
> conditions that can be attributed to systemic rheumatic disease
> including lupus and other problems.  However, it should be noted that
> the clinical manifestations in this case are not consistent with the
> laboratory parameters or features of a systemic rheumatic disease.
> Without these clinical manifestations that are objective and
> consistent, one would have difficulty attributing simply her having
> pain, fatigue and depression to a lupus like process or any other
> systemic rheumatic disease.  Therefore, the clinical data do not
> support the presence of the abnormal serological testing as being
> related to her symptoms.

Ad. R. 897-898.

As to Kruk's mental and emotional condition, the Schoen report caused  MetLife to obtain

an opinion from a different psychiatrist, Dr. Busch (in place of Dr. Givens).  Dr. Busch produced a

psychiatric report that resulted in MetLife rescinding its denial of all disability benefits, and paying

Kruk the 24-month maximum amount available under the Plan for a disability due to a mental or

emotional disease.  MetLife relies upon Dr. Payne's two rheumatological reports in denying Kruk

20

benefits for a disability due to a physical illness Kruk asserts to be lupus.

The decisive question in the case is whether, in the totality of circumstances as revealed by the evidence, MetLife's partial denial of disability benefits constitutes an abuse of process.

## D.    __Analysis__

Pechiney's employee benefits Plan provides that a participant is entitled to LTD benefits if, after the first two years of the participant's long term disability period, the participant is "totally and permanently disabled and unable to perform any job for which [she] is qualified by education, training, or experience."  Unfortunately and sadly, the medical evidence in this case compels the finding, which the Court makes, that Rita Kruk is totally and permanently disabled, as that condition is generally defined in the Plan.

Dr. Payne's conclusions are not to the contrary.  His first report concluded *only* that "a diagnosis of lupus or any related disorder is not supported by the objective medical data presented," and "with respect to any rheumatic disease process, records do not support the existence of functional impairments that would preclude Mrs. Burrock-Kruk from performing her occupation as of 7/19/00." Ad. R. 903.  When Dr. Payne says in his second report that "my determination is unchanged; Ms. Burrock-Kruk is capable of unrestricted work," Ad. R. 897, he means what he said before: no less, but also no more, which explains my emphasis on the adverb "only" in the preceding sentence. Distilled to its essence, Dr. Payne's opinion is that Kruk is not physically disabled – which is to say, she is not rendered incapable of unrestricted work – by lupus or a related systemic rheumatic disease.

To the extent that Dr. Payne's conclusions differ with those of Dr. Schoen in respect of Kruk's affliction by the physical disease of lupus or a related connective tissue disorder, the medical

21

evidence reveals a disagreement between physicians.  However, a focus upon that issue does not

fully address the nature of Kruk's disability.  The medical evidence shows, and I find, that Kruk was

disabled as of July 19, 2000, and remains so today, by a combination of symptoms and ailments:

some readily ascribable to mental or emotional disease (severe depression, anxiety, cognitive

impairment); others more readily ascribable to physical disease (arthralgias,[5] anemia), still others

of less determinable origin (fatigue, sleep disturbances).   In that respect, the case at bar resembles

the situation presented in *Sheehan v. Metropolitan Life Ins. Co.*, 368 F.Supp.2d 228 (S.D.N.Y.

2005), where I had occasion to say:

> On March 31, 2001, and at the present time, Sheehan was and is
> suffering from that condition known as "comorbidity," which is a
> confluence of two illnesses existing at the same time.  In Sheehan's
> case, the comorbid illnesses were and are coronary heart disease, a
> physical illness, and cardiac neurosis, a psychiatric illness. . . . I find
> on all the evidence that on March 31, 2001, and at the present time,
> Sheehan was and is totally disabled from full-time employment as the
> result of the combined effect of two comorbid illnesses: coronary
> artery disease and cardiac neurosis.

*Id*. at 256, 259.

The brief for Kruk on the present motion acknowledges *en passant* that MetLife paid Kruk

disability benefits for a psychiatric or psychological illness, and then focuses entirely upon the

asserted physical cause for her disability ("On May 14, 2007 MetLife approved Kruk's claim based

on her psychological ailments, but continued to deny LTD benefits based on her physical ailments.")

Plaintiff's Brief in Opposition [Doc. 71] at 10.  Because the Court must consider the medical

evidence in its totality,  a more detailed description of the evidence concerning Kruk's mental or

---

[5]  "Arthralgia"  is a medical term defined  as severe pain  in  a  joint, frequently attendant
upon rheumatoid arthritis.

emotional illness is required.

The medical evidence concerning Kruk's mental and emotional condition (for which "psychiatric" and "psychological" are interchangeable adjectives) is found in the several reports of Dr. Tec, Kruk's treating psychiatrist since 1995, and the report of Dr. Kenneth G. Busch, the independent psychiatrist MetLife retained to review Kruk's case after Dr. Schoen, retained by Kruk, submitted his report. Quotations from the reports of Dr. Tec and Dr. Schoen appear in Part II.C. Dr. Busch reviewed Kruk's file on March 30, 2007. His report is found at Ad. R. 884-893.

Dr. Busch's report focuses primarily upon Dr. Tec's letter reports, as one would expect, since these physicians are both psychiatrists. The form MetLife sent to Dr. Busch posed the question of whether the medical information in Kruk's file supported "functional limitations and severe psychiatric impairments beyond 07/20/00 that would have precluded the Claimant from performing job duties on a full time basis as Human Resource Specialist?" Dr. Busch answered that question "Yes," and then gave a detailed and extensive statement of his reasons, from which I will quote:

> The medical documentation from the Psychiatrist, Dr. Leon Tec, was extensive and indicated the Claimant had been severely depressed and not able to concentrate for many years. . . . The Claimant was under his care since 1996 and there was significant deterioration in July of 2000 to the point of severe depression. . . . Letter on 10/15/02 indicated the Patient was not disabled when first starting treatment in 1996. The disability occurred in July of 2000. The diagnosis was major depression. Prior to July of 2000 the Patient had anxiety but was not significantly depressed. There were associated medical problems that were severe including lupus and a heart condition.
>
> *        *        *        *        *
>
> A letter was written by Dr. Tec on 05/24/01. This indicated the Patient was suffering from severe depression. She was distraught and suffered from loss of energy. She had poor sleep and feelings of hopelessness and helplessness. In addition, the Patient had a poor appetite, low self esteem and inability to concentrate and had

23

difficulty making decisions.  She was not able to be employed in any
capacity.  Her depression was severe and it was Dr. Tec's opinion that
the Patient should be on long term disability.  Medications were
increased to Paxil 40 mg daily and there was no response.

\*      \*      \*      \*      \*

The most recent letter from Dr. Tec was dated 09/23/06.  The
Claimant was taking Wellbutrin XL 150 mg daily.  Her concentration
was still extremely poor.  She was not able to focus on anything she
would do.  It was Dr. Tec's opinion that the Patient be placed on long
term disability status on a permanent basis.

\*      \*      \*      \*      \*

In summary, the medical information is substantial from the
Psychiatrist, Dr. Tec, to indicate the Claimant suffered severe
psychiatric impairments from 07/19/00 and beyond.  She would not
have been able to concentrate or focus on her job duties as a Human
Resource Specialist beyond 07/19/00 through the last medical
information from Dr. Tec in his letter dated 09/23/06.

Ad. R.  885-890.  A follow-up question on MetLife's form asked Dr. Busch to "identify the

functional limitations" his review of Kruk's medical records revealed.  Dr. Busch's response

included:

All of the information from Dr. Tec is consistent to indicate severity
of impairments.  These impairments included apathy, poor
concentration, loss of energy, feeling distraught, poor appetite,
difficulty making decisions, poor concentration, short term memory
loss, inability to function in a work situation and difficulty in making
decisions in reading, writing and working on the computer.  In
addition, Dr. Tec indicated, on 08/24/05, that her depression is
complicated by her physical conditions.  The last letter from Dr. Tec
on 09/23/06, continued to indicate concentration was extremely poor
and that the Claimant cannot focus on anything she does.

Ad. R. 891.

MetLife delivered its final decision on Kruk's LTD claim in a letter to her counsel dated

May 14, 2007,  Ad. R. 595-598 ("the Decision Letter").  It is this decision by MetLife as Plan

24

administrator that Kruk challenges in this action.  The Decision Letter states:

> As part of the appeal process two Independent Physician Consultants ("IPC") reviewed Ms. Kruk's claim file.  The first physician consultant [Dr. Payne] is board certified in rheumatology and internal medicine and the second physician consultant [Dr. Busch] is board certified in psychiatry.
>
> The rheumatology IPC summarized Ms. Kruk's medical history.  Ms. Kruk has multiple symptoms of widespread pain and fatigue with multiple somatic features that have been present over a period of several years.  The consultant noted that her rheumatologist Dr. Schoen opined that Ms. Kruk was experiencing a lupus like phenomenon.  The diagnosis was based on the clinical findings of laboratory abnormalities.  The medical documentation included a workup has findings [*sic*] of positive IgM and IgG anticardiolipin antibodies in addition to a positive double standard DNA, positive Smith antibody and an ESR of 31.
>
> The rheumatology IPC reported that there were no specific clinical indications of systemic lupus or other systemic rheumatic conditions present that would be expected to produce restrictions or limitations in activity.  This consultant also reported that there were no specific cardiac, pulmonary, gastrointestinal, or neurological findings that were considered restricting or limiting.
>
> The rheumatology IPC reported that while Ms. Kruk has serological findings that are quite abnormal it should be noted that the clinical manifestations in this case are not consistent with the laboratory parameters or features of a systemic rheumatic disease.
>
> The rheumatology consultant concluded that the medical information does not support functional limitations beyond July 20, 2000 and Ms. Kruk is capable of unrestricted work activities.
>
> &ast; &ast; &ast; &ast; &ast;
>
> However, with respect to her reported psychiatric condition, the psychiatric IPC concluded that the medical information did support functional limitations and severe psychiatric impairments beyond July 20, 2000 that would have precluded Ms. Kruk from performing her job duties on a full-time basis as a Human Resources Specialist.  As of January 18, 2003, mental illness disability benefits will have been

> paid for the maximum allowed duration of 24 months per the plan
> provision regarding those benefits. . .
>
> In summary, the documentation provided for review has failed to
> provide medical evidence of a severity of physical impairment that
> would preclude Ms. Kruk from gainful employment in her own
> occupation as a Human Resource Specialist.  As of January 19, 2003,
> she no longer meets the definition of disability as defined by the plan
> and no longer eligible [*sic*] for any additional benefits.
>
> Therefore, for the reasons noted above, we find that the decision to
> deny additional LTD benefits beyond January 18, 2003 is appropriate
> and will remain in effect.

Ad. R. 596-598.

The core substantive question before the Court is whether the conclusions MetLife announced in this Decision Letter are arbitrary and capricious.   In the context of MetLife's present motion for summary judgment, the question is whether MetLife has shown there is no genuine issue of material fact with respect to that question, and that MetLife is entitled to judgment as a matter of law.

What is an "arbitrary and capricious" decision to deny benefits in an ERISA-controlled case? In *Durakovic v. Building Service 32J Pension Fund*, 609 F.3d 133 (2d Cir. 2010), Chief Judge Jacobs put that question rhetorically and answered it succinctly:

> Was the Funds' decision arbitrary and capricious?  In conducting that
> review, a court may overturn a plan administrator's decision to deny
> benefits only if the decision was without reason, unsupported by
> substantial evidence or erroneous as a matter of law.  Substantial
> evidence is such evidence that a reasonable mind might accept as
> adequate to support the conclusion reached by the administrator and
> requires more than a scintilla but less than a preponderance.

609 F.3d at 141 (citations and internal quotation marks omitted).  In *Hobson*, 574 F.3d 75 at 83, the Second Circuit voiced the same principle ("Under the arbitrary and capricious standard of review,

we may overturn an administrator's decision to deny ERISA benefits only if it was without reason,

unsupported by substantial evidence or erroneous as a matter of law"), and added:

> This scope of review is narrow; thus, we are not free to substitute our
> own judgment for that of [the insurer] as if we were considering the
> issue of eligibility anew.

574 F.3d at 83-84 (citation omitted).  The *Hobson* court also cited and quoted with approval a Tenth

Circuit case:

> We are also not persuaded that MetLife abused its discretion by not
> taking into consideration the side effects Hobson allegedly suffered
> due to the daily medications she took to address her conditions. . . .
> As the Tenth Circuit explained in rejecting a similar claim, "the
> question for this court is not whether MetLife made the 'correct'
> decision [but] whether MetLife had a reasonable basis for the
> decision it made."

*Id*. at 89 (citing and quoting *Chalker v. Raytheon Co.*, 291 F. App'x 138, 145 (10th Cir. 2008)).

In the case at bar, the medical evidence makes it clear that in the year 2000, when Kruk

ceased her employment, and continuing to the present time, she suffered and suffers from the

combined effect of two comorbid illnesses: one mental or emotional in nature, the other physical in

nature.  Since MetLife has paid Kruk's maximum entitlement to benefits under the Plan for disability

due to a mental or emotional illness, Kruk would be entitled to additional disability benefits only if

she could prove that her physical condition by itself would render her totally disabled, that is to say,

unable to perform any job for which her education, training or experience would qualify her.

That is the holding in *Sheehan*, 368 F.Supp.2d 228, where the plaintiff suffered a serious

heart attack, recovered from it, but as a result of the attack developed cardiac neurosis, a recognized

mental disorder generated by fear of a recurrence.  "The *physical* cause of a cardiac neurosis does

not make the condition any less a *neurosis*."  368 F.Supp.2d at 263.  As in the case at bar, Sheehan's

27

entitlement to benefits for disability resulting from a mental condition was more limited than for a disability with a physical cause.  Sheehan suffered his heart attack on November 25, 1995.  MetLife paid him disability benefits until March 31, 2001, at which time it determined that from a physical standpoint Sheehan was no longer disabled, and the 24-month period of time for benefits for a psychiatric condition had expired.  MetLife terminated Sheehan's benefits.  Sheehan sued under ERISA.

After bench trial, I held that Sheehan's physical cardiac condition disabled him until June 2003, when he underwent successful surgery involving implantation of a stent.  "Up to that point in time," I found on the evidence, "Sheehan's cardiac condition was totally disabling."  368 F.Supp.2d at 264.  "However, Sheehan has not proved that subsequent to the June 2003 surgical procedure, his cardiac condition in and of itself is totally disabling."  *Id*. That failure of proof precluded any payment of disability benefits after June 2003, as a result of the court's finding that after that date comorbidity existed between physical coronary artery disease  and psychiatric cardiac neurosis, and the court's holding that since Sheehan's entitlement to benefits for disability resulting from psychiatric disease had been exhausted, his entitlement to additional disability benefits existed only if the physical cardiac condition by itself would constitute a total disability.  To hold otherwise would deprive the employer of the plan's limitation on benefits for mental illness.  The court granted Sheehan disability benefits up to June 2003 but not thereafter.

In *Sheehan,* both parties appealed the district court's judgment: Sheehan, on the ground that he should have received disability benefits after June 2003; and MetLife, on the ground that Sheehan was not entitled to benefits after May 2001.  The Second Circuit rejected both appeals in an unreported summary order, leaving the district court's judgment undisturbed.

I think that the rationale in *Sheehan* is sound, mandated by governing law, and applicable to the case at bar.  Application of the *Sheehan* rationale to the instant case results in this time line: MetLife's payments of disability benefits to Kruk for the period January 19, 2001 to January 18, 2003 cover the maximum time allowed by the Plan for disability caused by mental or emotional disease. Mental disease and physical  disease were comorbid illnesses afflicting Kruk before and up to January 18, 2003, and continued to do so thereafter.  To be entitled to disability benefits after January 18, 2003, Kruk must prove that her physical disease, in and of itself and entirely disregarding her mental and emotional disease, was totally disabling.

The case for MetLife is that Kruk cannot make that showing.  MetLife relies upon the opinions of the two independent physicians it consulted.  Dr. Busch, the psychiatric consultant, opined that the medical history of Kruk's psychiatric condition showed she was totally disabled by that condition.  Dr. Payne, the rheumatology consultant, opined that the medical history of Kruk's physical condition did not show functional limitations, and that from a physical standpoint she was capable of unrestricted work activities.  If one accepts those opinions, Kruk has no entitlement to disability payments after January 18, 2003.

The case for Kruk, emphasized in her brief,  is that the physical disease of lupus rendered her totally disabled throughout the entire period of time and does so today.  For the reasons stated, Kruk has to contend that lupus, standing alone and without regard to her comorbid mental illness, rendered her totally disabled.    That essential proposition is compromised by the report of the first rheumatologist Kruk consulted: in June 2000, Kruk was referred to Dr. Kagen, a rheumatologist. Dr. Kagen suspected that Kruk might have a lupus-like disease; his first recorded impression was "Rule out connective tissue disorder (?)."  After ordering additional tests, in August 2001 Dr. Kagen

29

advised Kruk's counsel by letter that "the diagnosis of Lupus is not absolutely confirmed."  This is less than a ringing declaration that Kruk was totally disabled by lupus.

In 2006, Kruk's attorney arranged for her to consult Dr. Schoen, a rheumatologist affiliated with Yale Medical School.  Dr. Schoen's report concludes with the statement that "in my opinion, Mrs. Kruk has been disabled since July 2000 *by her depression and by connective tissue disease*" (emphasis added), which I interpret to be a designation of comorbid diseases afflicting Kruk and causing her disability.  Dr. Schoen nowhere opines that lupus or some other connective tissue, standing alone, would render Kruk totally disabled.  Instead,  when he came to describe the causes of Kruk's disability, Dr. Schoen first cited "depression."[6]

Careful reading of Dr. Schoen's report and Dr. Payne's response to it reveals a point of difference between these two rheumatologists.  Dr. Schoen bases his diagnosis of "connective tissue disease, most probably systemic lupus erythematosus" upon "multiple abnormal autoantibodies" appearing in blood tests.  Dr. Payne, who examined some of this laboratory data for the first time, acknowledged the presence of "serological findings that are quite abnormal" and "are specific for conditions that can be attributed to systemic rheumatic disease including lupus and other problems." However, Dr. Payne declined to make a diagnosis of lupus because in all of Kruk's medical records (which included Dr. Schoen's description of his physical examination of Kruk), "there are no specific clinical features of SLE or other systemic rheumatic conditions that would be expected to be producing restrictions or limitations upon activity."  In Dr. Payne's view, "the clinical manifestations

---

[6]  Kruk says  in  her  brief  at 10: "First and foremost, Dr. Schoen determined that Kruk is totally disabled due to Lupus, or other connective tissue disorder, and has been total [*sic*] disabled since at least July 2000."  That assertion edits and distorts Dr. Schoen's opinion, quoted in text, that "Mrs. Kruk has been disabled since July 2000 *by her depression and* by connective tissue disease" (emphasis added).

in this case are not consistent with the laboratory parameters or features of a systemic rheumatic disease."  Dr. Payne reasoned that "without these clinical manifestations that are objective and consistent, one would have difficulty attributing her having pain, fatigue and depression to a lupus like process or any other systemic rheumatic disease"; he concludes that "the clinical data do not support the presence of the abnormal serological testing as being related to her symptoms."

MetLife relied upon Dr. Payne's two opinions, viewed in the context of Kruk's entire medical records, when it denied Kruk's claim for long term benefits based upon total disability caused by a physical illness or disease.  Kruk challenges that denial as violative of ERISA.  The rule derived from the cases cited *supra* is that a court cannot disturb the denial of benefits by a plan administrator vested with decision-making discretion, unless the decision denying benefits was arbitrary and capricious, as that phrase is defined by Second Circuit authority.

However, Kruk seeks to hold MetLife to a stricter scrutiny, based upon perceived errors, lapses and departures from fair dealing during the course of Kruk's applications for LTD benefits. Kruk argues in her brief at 13-14 that "MetLife's decision to deny Kruk's LTD Claim should not be afforded much if any, discretion, on account of its bad faith" in the following asserted respects:

Ignoring evidence in the records;

Failing to explain why MetLife disagreed with the findings of Kruk's treating physicians in any logical or reasoned manner;

Making factually inaccurate statements;

Stating that certain testing procedures should be applied to Kruk's claim when, in fact, they should not have been;

Hiring doctors who were financially incentivized to deny valid benefit claims;

Hiring doctors that have been discredited by other courts for their

questionable conclusions;

Failing to follow their own internal operating procedures by (1) retaining the same doctor to review his own work, (2) failing to obtain an independent medical examination ("IME") and (3) failing to obtain a functional capacity examination.

Kruk has every right to voice criticisms such as these.  Section 503(2) of ERISA requires that claims for benefits be afforded a "full and fair review by the appropriate named fiduciary of the decision denying the claim."  29 U.S.C. § 1133(2).  The thrust of Kruk's several complaints is that MetLife's review of her claim for LTD benefits was neither full nor fair. The Court is bound to consider these assertions with care.

After careful consideration of Kruk's criticisms, I conclude that they do not, either singly or in the aggregate, demonstrate that MetLife's review of Kruk's claim was not full or fair.  Some critical comments are conclusory or argumentative and merit no discussion.  Others focus specifically upon the several physicians involved in the case.  These contentions lack substance.  It is difficult to discern the basis for Kruk's charging MetLife with "Failing to explain why MetLife disagreed with the findings of Kruk's treating physicians in any logical or reasoned manner." Kruk's two treating physicians were Dr. Tec, her psychiatrist, and Dr. Witt, her internist.  On Kruk's administrative appeal MetLife appointed an independent psychiatrist, Dr. Busch, who agreed with Dr. Tec.  In consequence, Kruk's appeal succeeded to the extent that she received maximum benefits for disability caused by mental illness.  Notwithstanding Kruk's conclusory accusation in her brief, Dr. Busch did not disagree with Dr. Tec: on the contrary, he agreed with him, and as a result, Kruk received limited disability benefits.

As for Kruk's present claim of disability caused by lupus, while Dr. Witt was Kruk's treating

physician, he was not a rheumatologist: he made no findings about that disease.  Dr. Kagen, not a treating physician but a rheumatologist to whom Kruk was referred for a consultation, declined to diagnose lupus.  Dr. Schoen, a rheumatologist, was also a one-time consultant, not a treating physician.  To the extent that Dr. Schoen diagnosed the possible presence of lupus or another connective tissue disease on the basis of serological tests, Dr. Payne disagreed with him, on the basis of the absence of other clinical manifestations.  Dr. Payne's opinion is "reasoned," which is to say, he gave his medical reason.  This lay judge is not in a position to say that medical reason is "illogical."  More to the point, courts do not engage in that sort of scrutiny when asked to rule that a plan administrator's denial of benefits was arbitrary and capricious.

Kruk's criticisms that MetLife hired doctors "who were incentivized to deny valid benefit claims" and "have been discredited by other courts for their questionable conclusions" focus primarily upon Dr. Payne, who was assigned to Kruk's case by a consulting firm, Network Medical Review Company, which a number of reported cases, cited and quoted by Kruk's brief at 25-26, indicate MetLife uses with some frequency.  Those case quotations show, Kruk asserts, that "MetLife continues to trot out the same doctors giving the same opinions in the hopes that no one figures out that MetLife has a formula for denying valid claims."  Brief at 25.

One case Kruk cites in seeming support of that indictment is *Suren v. Metropolitan Life Ins. Co.*, No. 07-CV-4439, 2008 WL 4104461, at *6 (E.D.N.Y. Sept. 26, 2008).  Kruk's brief at 25-26 quotes a snippet from Judge Gleeson's opinion: "The entire medical file, including the new medical information, was referred to two more IPCs for expert medical opinions: Dr. Reginald Givens, a psychiatrist and neurologist, and Dr. Dennis Payne, a rheumatologist and internist.  Though neither is a MetLife employee, both work for NMR/Elite Physicians, which has a lucrative contract with

MetLife."  Kruk's brief brandishes this quotation, in a spirit of "Gotcha," because Drs. Givens and

Payne were also retained by MetLife to give opinions in her case.  Judge Gleeson did indeed include

the quoted remarks in his opinion, 2008 WL 4104461 at *6, but Kruk's brief omits mentioning that

the opinion granted MetLife summary judgment in respect of its denial of both the plaintiff's claims

for disability benefits.  During the course of his discussion, Judge Gleeson also said (although Kruk's

brief did not quote):

> Although Suren submitted documentation from treating physicians
> who found her disabled based on illnesses in February 2005, the mere
> existence of conflicting evidence does not render [MetLife's] decision
> arbitrary or capricious.  Moreover, ERISA does not require the plan
> administrator to accord deference to a treating physician's
> conclusions.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822,
> 833-34 (2003).  Finally, it is not an abuse of discretion for claim
> administrators to credit the opinions of independent reviewing
> physicians.
>
> In short, the Plan afforded MetLife the discretion to weigh different
> medical opinions and to determine, based on the evidence submitted,
> whether Suren in physically able to work.  In its exercise of that
> discretion, MetLife permissibly relied on the IPCs' conclusions that
> Suren was not disabled within the meaning of the Plan.

2008 WL 4104461, at *9 (internal quotation marks and some citations omitted).  These independent

reviewing physicians' affiliation with NMR does not appear to have made Judge Gleeson skeptical

of their opinions.  Counsel's selective quotations from the *Suren* opinion make this Court somewhat

skeptical of their argument on the point.

It is noteworthy that in *Hobson*, 574 F.3d 75, the Second Circuit cited *Suren* with approval

and quoted from it.  In the course of its opinion affirming the district court's grant of summary

judgment to a plan administrator which denied disability benefits, the Second Circuit said:

> MetLife had a total of seven independent physicians, none of which

34

> was a MetLife employee, and all of whom were Board-certified in
> one or more of the specialty areas relevant to Hobson's diagnoses and
> conditions, review Hobson's file.  MetLife did not abuse its discretion
> by considering these trained physicians' opinions solely because they
> were selected, and presumably compensated, by MetLife.  *See Suren*,
> 2008 WL 4104461, at *11 ("That they were paid consultants does not
> disable MetLife from considering their opinions in making benefits
> decisions.").  Indeed, it is customary for plan administrators to do so
> in evaluating ERISA claims.  Second, MetLife is not required to
> accord the opinions of a claimant's treating physicians "special
> weight," especially in light of contrary independent physician reports.
> *Black & Decker*, 538 U.S. at 834.

574 F.3d at 90.

These authorities suffice to dispose of Kruk's various aspersions about the independent

physicians MetLife consulted, in particular Dr. Payne, who was Board-certified in rheumatology.

To the extent that other circuit courts, or district courts outside this circuit, express greater degrees

of concern about MetLife's retention or compensation of independent physician consultants, such

judicial disquiet is inconsistent with the law of this Circuit.

It follows that MetLife was entitled to seek, pay for and consider Dr. Payne's opinions about

Ms. Kruk's physical condition.  MetLife was also entitled to prefer Dr. Payne's opinions concerning

Kruk's physical condition over the opinions of other physicians, to the extent the opinions differed

on the existence *vel non* of disability caused by lupus, although as pointed out previously, and

contrary to certain assertions in Kruk's brief, the physicians on which Kruk relies were equivocal in

expressing that conclusion.

Kruk complains that "MetLife impermissibly allowed Dr. Payne to review his own prior

opinions," Brief at 26, a criticism based on the assertion that "Dr. Payne served as the medical

consultant who reviewed the appeal of Kruk's LTD Claim in 2005, prior to remand in *Kruk I.*  Thus,

Dr. Payne twice reviewed Kruk's claim and, not surprising, concurred with his own prior opinion." Brief at 27.  MetLife's Reply Brief at 9-10 states without subsequent contradiction that Dr. Payne "reviewed Kruk's claim after remand," was consulted again to comment upon Dr. Schoen's report, and "was not consulted by MetLife in connection with *Kruk I.*"  The dates on the several reports in the administrative record show this to be true.  I discern no impropriety in MetLife asking Dr. Payne to critique Dr. Schoen's critique of Dr. Payne.

Kruk also criticizes MetLife for "failing to obtain an independent medical examination (IME)" and "failing to obtain a functional capacity examination."  The Second Circuit precluded those arguments in *Hobson*, which held that "as the four circuits that have addressed the question have concluded, where the ERISA plan administrator retains the discretion to interpret the terms of its plan, the administrator may elect not to conduct an IME, particularly where the claimant's evidence on its face fails to establish that he is disabled."  574 F.3d at 91 (footnote omitted).  The Second Circuit continued in *Hobson*:

> Because this court only disturbs a plan administrator's determination if it is arbitrary and capricious, we are unconvinced that the Plan obliged MetLife to conduct an IME; rather, by not ordering such an examination, MetLife simply exercised its discretion to decline to pursue one option at its disposal.

*Id*.

There is a failure of proof by the claimant in the case at bar because Kruk was clearly disabled by depression, a mental illness, and MetLife paid her full benefits for that disability.  The most that can be said for Kruk's proof of a disabling physical illness is that Dr. Schoen derived from serological tests the belief that lupus or some other connective tissue disease was present, which *together with Kruk's depression* disabled her.  A case like *Sheehan* teaches that where comorbid

diseases are present, and a claimant seeks disability benefits on the basis of only one of those diseases, the claimant must establish that the specified illness, standing alone and without the influence of the other comorbid disease, caused that total disability for which benefits are sought. There is no proof in the record of that requisite circumstance.

In conclusion: On human terms, one can only sympathize with Rita Kruk, who is cruelly and unfairly afflicted.  However, when a court is asked to vacate the decision of a benefits plan administrator, the case is governed by the rule of law, with all its attendant precedents, burdens, balancing of interests, and limitations.  That is the task set before this Court in the case at bar. Having carefully reviewed the medical evidence, in the light of governing Supreme Court and Second Circuit authority, I am unable to conclude that MetLife acted arbitrarily and capriciously in denying Kruk long term disability benefits after January 18, 2003.  MetLife was entitled to choose between the medical opinions in the record, and rely upon certain of them, which furnish substantial evidence for the decision MetLife made.  On administrative review MetLife reversed a prior total denial of benefits and paid them for the maximum 24 months allowed for a disability caused by mental illness: a circumstance suggestive of and consistent with that full and fair review to which the ERISA statute entitled Kruk.

In consequence, MetLife's motion for summary judgment will be granted, with respect to the propriety of its terminating payment of long term disability payments to Kruk after January 18, 2003.[7]  There must be a remand of the case in order to consider the additional issues discussed in

---

[7] For the reasons stated in text, Kruk cannot point to any genuine disputes as to material facts that would preclude summary judgment for MetLife as a matter of law under Rule 56. Summary judgments are frequently entered in ERISA cases such as this one: *Hobson* was an appeal from summary judgment in a plan administrator's favor; Judge Gleeson granted summary judgment to the administrator in *Suren*; another recent example is Judge Hall's decision in *Gaud-Figueroa v.*

Part II.E., *infra*.

E.      **The Amount to Which Plaintiff is Entitled**

In 2007, after remand from Judge Covello's order and a second administrative appeal, MetLife decided that Kruk was entitled to LTD benefits for and during the period from January 19, 2001 to January 18, 2003.  MetLife calculated the base amount of those benefits to be $136,214.40. "After withholding $36,257.59 in federal and state income taxes, MetLife paid plaintiff $99,956.81 on May 31, 2007."  Defendant's Local Rule 56(a)(1) Statement [Doc. 58] at ¶ 52.

On this motion, Kruk does not agree to that net amount at face value.  Three questions arise:

First, is Kruk entitled to prejudgment interest on benefits to which she was entitled, and should have been paid during 2001-2003, but were not paid until 2007?

Second, what is the basis for MetLife's calculation of Kruk's federal and state income taxes on the gross disability benefits amount?

Third, is MetLife entitled in the circumstances of the case to deduct income taxes from the payment it made to Kruk in 2007?

_____

*Metropolitan Life Insurance Co.*, 771 F.Supp.2d 207 (D. Conn. 2011).

Kruk professes to find support in this Court's decision in *Fairbaugh v. Life Ins. Co. of North America,* 737 F.Supp.2d 68 (D. Conn. 2010). While the plaintiff claimant in *Fairbaugh* won and the benefits plan administrator lost, the determinative facts bore no resemblance to those in the case at bar. Fairbaugh's long term disability benefits, having been approved and paid for a year, were suddenly terminated by the administrator, ostensibly in reliance upon additional medical records indicating "that plaintiff's condition had remained largely unchanged, or, if anything, had worsened since disability benefits had been granted." 737 F.Supp.2d at 81. I concluded without difficulty: "It is unclear how a neuropsychological evaluation performed in 2007, which was already on file when both Plaintiff's short and long term disability claims were approved in 2008, could possibly provide a rational basis for revoking Plaintiff's disability benefits in 2009." *Id.* There being no rational basis for the administrator's termination of benefits, it followed as the night the day that its action was arbitrary and capricious, and could not stand. The case at bar is quite different.

38

These issues are touched on by the briefs of counsel on the motion, but not fully explored. The first question is self-evident, and is one of law. The second question is factual, relatively straightforward, and MetLife must answer it. As for the income tax withholdings deductions MetLife says it made from the May 31, 2007 payment, the Court ventures these observations.

MetLife justifies paying Kruk an amount less than the total of her base disability benefits by articulating the phrase "after withholding $36,257.59 in federal and state income taxes." Tax Withholding is a familiar if unwelcome reality of life to most citizens of the Nation. The IRS introduces the subject on its current website as follows:

> **Withholding.** If you are an employee, your employer probably withholds income tax from your pay. Tax may also be withheld from certain other income – including pensions, bonuses, commissions, and gambling winnings. In each case, the amount withheld is paid to the IRS in your name.

That paragraph describes the usual situation, where the employee is currently employed, receiving regular income payments which are subject to withholding of income taxes by the employer. The employer's obligation is to pay the amounts withheld to the IRS in the employee's name. It is neither expected nor permissible that the employer put the withheld amounts in his, her or its own pocket. That is the way to prison.

In the case at bar, that traditional *mise en scene* is not present, since Kruk had not been employed by Pechiney since 2000, and MetLife did not pay her disability benefits (the functional equivalent of wages) until 2007. One must therefore ask: What did Pechiney and/or MetLife do with the $36,257.59 purportedly withheld from Kruk's benefits on account of federal and state income taxes? Were payments actually made to the taxing authorities? When, and in what respective amounts? And was notice of those payments, "in Kruk's name" (to revert to the IRS parlance), given

39

to Kruk?  It is conceptually possible, one supposes, that the circumstances may require an additional payment by a Defendant to Kruk, leaving her to calculate and pay her own federal and state income taxes.

The answers to these questions may be simple and uncontroversial, but the Court, which sits in part as one of equity, requires that they be made a part of the record, before final judgment can enter in the case.

### III.  CONCLUSION

The motions of Defendants Metropolitan Life Insurance Co., Inc. and Pechiney Plastic Packaging, Inc. (Doc. #56 & 61) are GRANTED IN PART, in that the Defendants are adjudged to have lawfully terminated long term disability payments to Plaintiff Rita Kruk on January 19, 2003. The case is REMANDED IN PART to the parties, for further proceedings consistent with Part II.E. of this Ruling.  Defendants are directed to file and serve a brief and affidavits addressing the questions posed in Part II.E. of this Ruling on or before **March 29, 2013.**  All assertions of fact must be in the form of a sworn affidavit or declaration.  Plaintiff is directed to file and serve responsive papers on or before **April 12, 2013.**  A final judgment will be entered in the case following the filing of the additional submissions directed in the preceding paragraph, and the Court's resolution of the issues discussed in Part II.E. of this Ruling.

It is SO ORDERED.

Dated:    New Haven, Connecticut
          March 13, 2013

                                        */s/Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge